UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

I.U. (by his guardian Ellen Roy), )
ELLEN ROY, and LYLE UPRIGHT, )
 )
  Plaintiffs, )
 ) Case No. 14-cv-12709-MAP
v. )
 )
PIONEER VALLEY CHINESE )
IMMERSION CHARTER SCHOOL, )
KATHY WANG, and REGAN HALL, )
 )
  Defendants. )

REPORT AND RECOMMENDATION REGARDING DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
AND MOTION FOR PARTIAL SUMMARY JUDGMENT
(Dkt. Nos. 61 and 68)

ROBERTSON, U.S.M.J.

I. INTRODUCTION

 This case arises out of disciplinary action taken against minor plaintiff I.U. by the Pioneer

Valley Chinese Immersion Charter School ("the School") on March 25, 2011, when he was a

nine-year-old third-grade student at the School.  In their First Amended Complaint

("Complaint") (Dkt. No. 57), I.U. and his parents, plaintiffs Ellen Roy ("Ms. Roy") and Lyle

Upright (collectively, "Plaintiffs"), bring claims against the School and individual defendants

Kathy Wang ("Ms. Wang") and Regan Hall ("Ms. Hall") (collectively, "Defendants") for

reckless and negligent infliction of emotional distress (Counts I and II, respectively); violation of

I.U.'s rights to procedural and substantive due process pursuant to 42 U.S.C. § 1983 (Count III);

and breach of contract based on the provisions of the School's Family Handbook (Count IV)

(against the School only).

Before the court are Defendants' motion to dismiss for failure to state a claim as to Counts III and IV (Dkt. No. 61) and Defendants' motion for partial summary judgment as to Counts I, III, and IV (Dkt. No. 68), both of which were referred by Senior District Judge Michael A. Ponsor for report and recommendation and heard on February 12, 2016 (Dkt. Nos. 67, 75, 100).  At the hearing, Defendants agreed that their motion for partial summary judgment supersedes their previously filed motion to dismiss and that the court need not separately address the motion to dismiss.  Accordingly, the court recommends that the motion to dismiss be denied as moot, and, for the reasons set forth below, that Defendants' motion for partial summary judgment be granted in part and denied in part.

II.    STATEMENT OF FACTS

The School is a Massachusetts charter school created through a charter granted by the Massachusetts Board of Education pursuant to Massachusetts General Laws ch. 71, § 89 (Dkt. No. 97-1).  The School's Board of Trustees holds the charter from the Commonwealth and is responsible for ensuring that the School and the members of the Board of Trustees comply with all applicable laws and regulations (Dkt. No. 97-2 at 1).

I.U. was a third-grade student in the School in 2011 (Defendants' Statement of Undisputed Material Facts ("Defendants' Facts"), Dkt. No. 72, ¶ 1).[1]  Before the incidents giving rise to this lawsuit, I.U. did not appear to have any serious behavioral issues, and the School had not disciplined him ("Plaintiffs' Statement of Material Facts ("Plaintiffs Facts"), Dkt. No. 80, ¶ 8).  I.U.'s English teacher, Ms. Hall, thought of I.U. as a particularly sensitive kid (*id.*, ¶ 12).

---

[1] In Plaintiffs' Statement of Material Facts, Plaintiffs make some additions to paragraphs 28 and 29 of Defendants' Facts, but otherwise adopt paragraphs 1 through 46 of Defendants' Facts as filed (Dkt. No. 80 at 1), on which the court, therefore, relies in substantial part.

I.U. visited the school nurse more than other students did, beginning in the second grade and escalating in the third (*id.*, ¶ 11).

On March 23, 2011, Marilyn Kusek ("Ms. Kusek"), an administrator at the School, told Ms. Wang, the principal, that I.U. had punched her daughter, Natalie, a first-grade student, at the water fountain. The following morning, on March 24, 2011, Ms. Kusek's wife advised Ms. Wang that the punch had hurt Natalie and that Natalie was afraid of I.U. (Defendants' Facts, ¶¶ 3-5). Ms. Kusek reported two additional incidents involving I.U. to Ms. Wang on March 24, 2011. First, Ms. Kusek told Ms. Wang that I.U. had "pushed and cornered" a younger child in the bathroom. The child and another student who came into the bathroom at the time of the incident supported this information (*id.*, ¶¶ 6-8). Later, Ms. Kusek told Ms. Wang that I.U. had dumped water from a pail on a younger girl's head (*id.*, ¶ 9). According to I.U., he did not punch Natalie, did not push and corner a boy in the bathroom, and spilled water on another child by accident (*id.*, ¶ 30). I.U.'s Chinese teacher later confirmed that the water-spilling incident was an accident (*id.*, ¶ 33).

At the end of the school day on March 24, 2011, Ms. Wang spoke with I.U. and his mother about these three incidents involving I.U. (*id.*, ¶ 10). During this conversation, Ms. Wang did not allow I.U. to present his version of the facts. She told I.U. that he was a "bad boy," and that if he was older, the police might have become involved. She also told I.U. that his dead grandfather would not approve of what he had done (Plaintiffs' Facts, ¶ 13). During this meeting, Ms. Wang did not tell Ms. Roy that I.U. would be punished for the three incidents (Defendants' Facts, ¶ 32). After Ms. Wang's conversation with I.U. and his mother, Ms. Wang spoke with Ms. Kusek about what the consequences of I.U.'s behavior should be (Plaintiffs' Facts, ¶ 14; Defendants' Facts, ¶ 11).

In the morning of the following day, March 25, 2011, Ms. Wang and Ms. Hall brought I.U. into a small room in the School, which was located just outside of Ms. Hall's classroom and a few steps away from the school nurse's office. Several days before, on March 22, 2011, I.U., at his request, had taken the MCAS test there (Defendants' Facts, ¶¶ 1, 12-13). When Ms. Wang took I.U. to the room, she had not decided how long his suspension in that location would last. She had decided to wait and see how the suspension went (Plaintiffs' Facts, ¶ 14).

I.U. tried to tell Ms. Wang and Ms. Hall that he had not done what he was accused of doing, but they would not give him the opportunity to do so. He asked them not to put him in the room (Defendants' Facts, ¶ 36). I.U.'s classmates knew he was being punished. I.U. was upset and crying. He asked Ms. Hall if he could call his mother and told Ms. Hall that calling his mother would make him feel better (*id.* at ¶ 37; Plaintiffs' Facts, ¶17a.). Ms. Hall told I.U. this was not a day to feel good and refused to let him call his mother. She also refused his requests to draw and to see his friends. He was not permitted to attend gym class, recess, lunch, a classmate's birthday party, or a party to celebrate the end of MCAS testing, and he was required to write apologies to the students he had allegedly harmed (Defendants' Facts, ¶¶ 38-41). At some point during the day, Ms. Hall slapped or hit I.U. on the back or the arm, although I.U. was not in physical pain at any time on March 25 (*id.*, ¶¶ 27, 43-44).

Ms. Hall brought I.U. English essay work on which he was behind to do while he was in the room (*id.*, ¶¶ 17-18). Ms. Hall left her classroom frequently during the day, and, when she did, she looked in on I.U. (*id.*, ¶ 14). The door to the room remained open, and Mr. Suzuki, a special education aide, sat outside the room all day (*id.*, ¶¶ 19-20, 22). In the course of supervising I.U., Mr. Suzuki told I.U. to do his school work (*id.*, ¶ 20). Mr. Suzuki escorted I.U. to the bathroom when I.U. needed to use it. I.U.'s Chinese teacher brought I.U. pizza for lunch.

When I.U. was thirsty, Mr. Suzuki allowed him to go to the water fountain as long as no other children were there (*id.*, ¶¶ 23-25).

At around 10:15 a.m. on March 25, 2011, Ms. Roy sent an email to Ms. Wang telling Ms. Wang that she had had a positive communication with a parent of one of the children involved in one of the incidents that precipitated the disciplinary action against I.U. (Plaintiffs' Facts, ¶ 16). Although Ms. Wang corresponded by email with Ms. Roy that day, she did not tell Ms. Roy that the School had imposed a full-day in-school suspension on I.U. (*id.*). When Ms. Roy picked I.U. up at around 3:15 p.m., Ms. Wang told Ms. Roy that they had decided to keep I.U. quiet and safe and the other kids safe and to give I.U. an opportunity to catch up on school work (Defendants' Facts, ¶ 45). Ms. Wang did not tell Ms. Roy about the in-school suspension or the conditions in which I.U. had spent the day (*id.*).

The Code of Conduct in the School's Family Handbook ("Handbook") provided, in pertinent part, as follows:

> Minor infractions to expected student behaviors and to any additional rules developed in the classroom are defined as those infractions that are addressed by the teacher or staff person responsible for the student when the infraction occurs. Examples of consequences for minor infractions are: loss of recess or other privileges, time out, being required to make amends and or apologize, and notification to a parent or guardian.

> Major disciplinary infractions are those problems that must be addressed by the Principal. A major infraction might consist of several minor incidents, or one serious incident of violent or illegal behavior . . . Whenever a major disciplinary infraction occurs, the Principal or another administrator will complete and send home a written Incident Report documenting what occurred. Parents/guardians are expected to return the signed report to the school the next day for the child to be readmitted to his/her class.

> Suspension of the student for up to ten days may be a consequence for a major disciplinary infraction. . . . When appropriate, suspensions will be administered "in-house", with the student being assigned the day's work and/or performing school-related chores under the supervision of the Principal or other administrators.

(Dkt. No. 68-10 at 2-3).

It was not normal for the School to administer an all-day in-school suspension or time-out to a student, or to direct a student to sit in the room in which I.U. was kept, although one student with severe behavioral issues had been sent to the room often (Plaintiffs' Facts, ¶ 18).  The school nurse thought that the School might have been too harsh on I.U. (*id.*, ¶ 18).  Plaintiffs' expert, Paul Wiley, concluded that the School acted outside of the acceptable standard of care in disciplining I.U. (*id.*, ¶ 20).  On June 5, 2011, the School's Board of Trustees suspended Ms. Wang and Ms. Hall for their role in disciplining I.U. (Dkt. No. 97-3, ¶ 1).

III.   DISCUSSION

A.  Summary judgment standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the summary judgment context, "[a] factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'"  *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (citations and internal quotation marks omitted)).  "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'"  *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering

evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).  Viewing the evidence in the light most favorable to the non-moving party requires crediting that party's evidence, even if such evidence is disputed by the moving party.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1867-68 (2014) (per curiam).

### B. Count I – reckless infliction of emotional distress

> To make out a claim of intentional or reckless infliction of emotional distress, the plaintiffs [are] required to show "(1) that [the defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe.

*Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014) (citing *Howell v. Enter. Publ'g Co.*, 920 N.E.2d 1, 29 (Mass. 2010); *Sena v. Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994)).  In Massachusetts, claims of intentional and reckless infliction of emotional distress are analyzed in the same manner.  *See Nancy P. v. D'Amato*, 517 N.E.2d 824, 827 (Mass. 1988) ("We have placed reckless and intentional infliction of emotional distress in the same category.").

"The standard for making a claim of intentional [or reckless] infliction of emotional distress is very high." *Doyle v. Hasbro*, 103 F.3d 186, 195 (1st Cir. 1996) (citing *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass. 1976)).

> "Liability cannot be predicated on 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Tetrault v. Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997) (quoting *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987)).  Conduct qualifies as extreme and outrageous only if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Roman v. Trs. of Tufts Coll.*, 964 N.E.2d 331, 341 (Mass. 2012) (quoting *Foley*, 508 N.E.2d at 82).

*Polay*, 10 N.E.3d at 1128 (alterations in original).  In *Agis,* the seminal case in Massachusetts, the court explained that this exacting standard is designed to limit frivolous suits and avoid litigation in which "'only bad manners and mere hurt feelings [were] involved.'" *Agis,* 355 N.E.2d at 319 (quoting *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974)).

Defendants challenge the sufficiency of Plaintiffs' evidence on a single element:  they assert that, even viewing the evidence in the light most favorable to Plaintiffs, the conduct alleged fails as a matter of law to rise to the level of "extreme and outrageous" (Dkt. No. 69 at 27-36).  "There is an issue for the jury if reasonable people could differ on whether the conduct is 'extreme and outrageous.'" *Boyle v. Wenk*, 392 N.E.2d 1053, 1056-57 (Mass. 1979) (citing *Agis*, 355 N.E.2d at 319).  Thus, the court must evaluate whether the evidence, viewed in the light most favorable to Plaintiffs and drawing all inferences in their favor, is sufficient to permit a reasonable person to conclude that Defendants' conduct was extreme and outrageous.  In conducting this evaluation, the court should not isolate individual incidents, but rather should "draw reasonable inferences from the totality of the circumstances," including whether the

individual at whom the conduct is directed is "known to be particularly susceptible to infliction of emotional distress," *Boyle*, 392 N.E.2d at 1055-56. Further, the court should "put as harsh a face on the [defendant's actions] as the basic facts would reasonably allow." *Roman*, 964 N.E.2d at 341-42 (alteration in original) (quoting *Foley*, 508 N.E.2d at 82).

While the parties work hard to analogize this case to other cases that have been decided by the courts of the Commonwealth and those in the First Circuit, neither party has identified any case applying Massachusetts law that involves a claim of intentional or reckless infliction of emotional distress brought by a young child subjected to discipline at school or any case with facts remotely similar to those at issue here (Dkt. No. 69 at 31-35; Dkt. No. 79 at 17-19). The cases cited by the parties are of limited use on the issue of whether the acts at issue here could reasonably be considered extreme and outrageous.

Federal and state courts in other jurisdictions, applying the law of other states, have been cautious about allowing intentional infliction of emotional distress claims that require inquiry into school discipline to proceed past the summary judgment stage. In *T.L. v. Sherwood Charter School*, 68 F. Supp. 3d 1295 (D. Or. 2014), the court granted summary judgment to the defendant school on an intentional infliction of emotional distress claim brought by an eighth-grade student, T.L., stating that "actions typically taken by school staff in the course of performing their education-related responsibilities, including disciplinary actions, even if negligent or reckless, should not be seen as inflicting extreme emotional distress unless accompanied by particularly appalling facts." *Id.* at 1321. The judge in *T.L.* did not find it "particularly appalling" that the school failed to separate T.L. from a male student who was sexually harassing her, suspended T.L. for inappropriate behavior directed at her harasser without hearing her side of the story and required her to write a letter of apology to him, and confiscated personal notes

she wrote at the suggestion of her therapist and disciplined her for writing the notes.  *See id.* at 1320-21.  The judge in *T.L.* noted that, under Oregon law, "[a] trial court plays a gatekeeper role in evaluating the viability of an [intentional infliction of emotional distress] claim by assessing tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability.'"  *Id.* at 1319 (quoting *House v. Hicks*, 179 P.3d 730, 736 (Or. App. 2008)).

Similarly, in *L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp. 3d 918 (M.D. Pa.), *appeal docketed*, Case No. 15-3465 (3d Cir. Oct. 15, 2015), the judge granted summary judgment to the defendant teacher on an eighth-grade student's claim for intentional infliction of emotional distress arising from the teacher making a series of offensive comments to him in front of his classmates, including telling him that she could not stand him and that other teachers also disliked him.  *See id.* at 924, 928.  The *L.H.* court noted that, under Pennsylvania law, only the most egregious conduct will support a claim for intentional infliction of emotional distress, and that it is for the trial court to "decide as an initial matter whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *Id.* at 927-28 (citing cases).  *See also Key v. Coryell*, 185 S.W.3d 98, 105 (Ark. Ct. App. 2004) (affirming dismissal of plaintiff's claim for outrage where the allegations, including that plaintiff's grade school teachers had yelled at him and had told him that he was bad, that his behavior was unacceptable, and to shut up, were not sufficiently outrageous as a matter of law). *But see H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992 (S.D. Ohio 2015) (denying school administrators' motion to dismiss plaintiffs' intentional infliction of emotional distress claims arising from allegations that teacher physically abused five disabled children); *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F. Supp. 2d 437 (M.D. Pa. 2007) (denying

motion to dismiss intentional infliction of emotional distress claim based on physical abuse of an autistic child used as aversive technique).

Notwithstanding these decisions from other jurisdictions, the court recommends that Defendants' request for summary judgment on Plaintiffs' claim for reckless infliction of emotional distress be denied for several reasons.  First, the evidence could support a finding that I.U. was "particularly susceptible to infliction of emotional distress," entitling him to extra protection under Massachusetts law.  *See Boyle*, 392 N.E.2d at 1056.  He was only nine years old, he was known, at least by Ms. Hall, to be particularly sensitive, and he made more frequent visits to the school nurse than his peers.  Massachusetts courts might not accord great deference to school administrators who recklessly exercised their disciplinary authority on a particularly vulnerable victim, a situation which the evidence here could substantiate.

Second, in *Tynecki v. Tufts Univ. Sch. of Dental Med.*, 875 F. Supp. 26, 34 (D. Mass. 1994), another session of this court indicated that it would not be inclined to take a hands-off approach to unmerited school discipline as a basis for a claim of intentional infliction of emotional distress.  In *Tynecki*, the plaintiff alleged that despite an investigation by a private dental school that raised considerable doubt about whether he was guilty of the misconduct for which he was disciplined (desecrating a cadaver), the school suspended him on "the barest and most unsubstantiated of allegations."  *Id.* at 34.  In response to the school's motion to dismiss, the court stated that "such conduct could be construed as 'extreme and outrageous' in satisfaction of the plaintiff's prima-facie case.  *Id.*  I.U.'s claims are, at least to some extent, factually similar: he claims that, at nine years old, he was wrongly accused of misconduct based on an incomplete

investigation, refused any opportunity to explain himself, and subjected to discipline far harsher than was normally meted out by the School.[2]

Finally, in Massachusetts, in contrast to other jurisdictions, while judges certainly may allow summary judgment motions on the ground that the mistreatment shown by the evidence does not rise to the level of extreme and outrageous, they are not formally designated as gatekeepers to evaluate whether claims rise to that level. *Compare Boyle*, 392 N.E.2d at 1056 (noting that it is for the jury to decide whether defendant's conduct was "rude and clumsy" or "extreme and outrageous"), *and Agis*, 355 N.E.2d at 318-19 (stating that, where reasonable men can differ on the question, it is for the jury to resolve whether the alleged conduct qualifies as extreme and outrageous), *with Sherwood Charter Sch.*, 68 F. Supp. 3d at 1319, *and Pittston Area Sch. Dist.*, 130 F. Supp. 3d at 927-28.

Plaintiffs here have produced evidence that, if believed, might show more than "'bad manners and mere hurt feelings.'" *Agis*, 355 N.E.2d 319 (quoting *Womack*, 210 S.E.2d at 148). Viewing the record in the light most favorable to Plaintiffs, considering the totality of the circumstances, and putting as harsh a face as possible on Defendants' actions, *see Tolan*, 134 S.Ct. at 1863; *Roman*, 964 N.E.2d at 341-42, as the court must at this stage, the evidence shows that Ms. Wang and others at the School failed to adequately investigate the three incidents in which I.U. allegedly was involved on March 23 and 24, 2011, and punished a nine-year-old child for misconduct he did not commit. The only person with whom Ms. Wang consulted in deciding

---

[2] In *Tynecki,* the judge dismissed the intentional infliction of emotional distress claim because the plaintiff failed to allege emotional distress resulting from the challenged conduct. *See Tynecki*, 875 F. Supp. at 34. In contrast, I.U. alleges in his complaint that, because of the trauma caused by the events on March 24 and 25, 2011, he ceased attending the School and began schooling at home (Dkt. No. 57, ¶ 65), and he and his mother testified at their respective depositions to the significant and enduring emotional distress the events at issue caused to I.U. (Dkt. No. 68-2 at 35-37; Dkt. No. 68-3 at 24-27).

how I.U. would be punished was Ms. Kusek, a parent of the child I.U. had allegedly punched and

an individual whom, it may be inferred, was unsympathetic to I.U.  When Ms. Wang met with

I.U. and Ms. Roy on March 24, 2011, she made statements to I.U that were harsh and

traumatizing about possible police involvement and what his dead grandfather would think of

him.  The next day, I.U. was shamed in front of his classmates when he was removed from his

classroom.  He was treated like a pariah and a threat to all of the other students at the School

throughout the day, even though he was known by Ms. Hall, the teacher who, with Ms. Wang,

placed him in the room, to be an especially sensitive child.  That sensitivity was on full display:

I.U. asked not to be confined to the small room, and when his plea was ignored, he began crying

and was visibly distraught.  He was refused the comfort of a telephone call to his mother and was

told he was supposed to be feeling bad.  At some point during the day, Ms. Hall either slapped or

hit him.  He was required to write apologies that he knew to be false to the children he had

allegedly harmed.  Ms. Wang did not tell I.U.'s parents on March 24, 2011 that he would be

disciplined, and, on March 25, 2011, she was not frank with Ms. Roy about what was happening

to I.U. at the School that day.[3]

_____

[3] Plaintiffs further allege that Defendants made false reports to the Department of Families and
Children ("DCF") when DCF investigated the discipline against I.U. and point to *McGrath v.
Sandwich*, 22 F. Supp. 3d 58, 70 (D. Mass. 2014) (Dkt. No. 79 at 17, 19), in which the plaintiffs
argued that it was "utterly intolerable for an official with the duty to uphold the law to make false
statements during a proceeding intended to guarantee basic fairness to a member of the
community."  *Id.*  The court, while agreeing with this proposition, held that the complaint failed
to state a claim because the plaintiff had not alleged that the officer caused him distress by the
false testimony.  *Id.*  Here too, Plaintiffs have not claimed that Defendants' communications with
DCF caused or contributed to I.U.'s emotional distress.  According to the amended complaint,
I.U.'s distress was caused entirely by the events at the School on March 24, 25, and perhaps 29,
2011, I.U.'s last day at the School.  His parents' claims are derivative of his claims (Dkt. No.
57).  Accordingly, Plaintiffs' allegations about Defendants' subsequent communications with
DCF are not relevant to their reckless infliction of emotional distress claims.  *See McGrath*, 22 F.
Supp. 3d at 70.

Although it is very close, "[t]his case falls . . . within the *Agis* framework. . . .   The jury [should] decide, from its own experience, whether these facts . . . are sufficient to meet the requirements outlined [in *Agis* and its progeny.]"  *McCarthy v. Szostkiewicz*, 188 F. Supp. 2d 64, 72-73 (D. Mass. 2002); *see also Fletcher v. Szostkiewicz*, 199 F. Supp. 2d 217, 232 (D. Mass. 2002) (declining to grant summary judgment on intentional infliction of emotion distress claim; "Jurors will also be able to make common sense judgments, from the totality of the circumstances, about what action is 'extreme and outrageous.'").  For the foregoing reasons, the court recommends that the District Judge to whom this case is assigned deny so much of Defendants' summary judgment motion as seeks judgment on Count I of the Complaint.

C. <u>Count III – procedural and substantive due process under 42 U.S.C. § 1983</u>

1. <u>Procedural due process</u>

Section 1983 is not a source of substantive rights.  *See, e.g., Varney v. Richards*, No. 1:15-cv-011-NT, 2015 WL 2381161, at *2 (D. Me. May 19, 2015).  To establish a procedural due process claim under 42 U.S.C. § 1983, Plaintiffs "must identify a protected liberty or property interest . . . and allege 'that the defendants, acting under color of state law, deprived [them] of that . . . interest without constitutionally adequate process.'"  *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006) (first citing *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005), then quoting *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 30 (1st Cir. 1991)); *see also S. Commons Condo. Ass'n v. City of Springfield*, 967 F. Supp. 2d 457, 463 (D. Mass. 2013).

To meet the first requirement, Plaintiffs rely on *Goss v. Lopez*, 419 U.S. 565 (1975), in which the United States Supreme Court held that "a student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may

not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id.* at 574.  The plaintiffs in *Goss* were a class of public high school students in Ohio who challenged a law that allowed school administrators to suspend a pupil for misconduct for up to ten days without a pre- or post-suspension hearing.  *Id.* at 567.  The critical phrase in *Goss* is as follows:

> [T]he total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child.  Neither the property interest in the educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.

*Id.* at 577.  As to the amount of process due for a suspension of ten days or less, the Court held that what was required was effective notice to the student and an informal hearing that permitted the "student to give his version of events . . . preferably prior to the suspension[.]"  *Id.* at 583-84.  Plaintiffs contend that the evidence in this case, viewed in the light most favorable to them, establishes that Defendants violated I.U.'s right to due process by suspending him from his classroom without permitting him to give his version of events (Dkt. No. 79 at 6).  Accepting for purposes of this motion that I.U. was placed on an in-school suspension (as opposed to a so-called time-out) on March 25, 2011, Defendants contend that they are entitled to summary judgment on Plaintiffs' procedural due process claim because any deprivation of I.U.'s property interest in a public school education was de minimis, and no procedure was due before the suspension was imposed (Dkt. No. 82 at 2-7).

Neither the United States Supreme Court nor the United States Court of Appeals for the First Circuit has addressed whether or when an in-school suspension constitutes "total exclusion from the educational process for more than a trivial period" as required under *Goss.  See id.*, 419 U.S. at 577.  However, Defendants find substantial support for their position in *Laney v. Farley*,

501 F.3d 577 (6th Cir. 2007), in which the court held that a one-day suspension did not deprive

the student of any constitutionally protected property interest, and in numerous cases decided by

federal district courts in other jurisdictions.  In *Laney*, the eighth-grade student served a one day

in-school suspension in the school administration office, without prior notice or the opportunity

to be heard, for violating the school cell phone policy.  *Id*. at 579-80.  The court observed that

"[w]hether an in-school suspension deprives a student of [an] interest in educational benefits

depends on the extent of her exclusion from the educational process."  *Id.* at 581.  Where the

student remained in the school setting and was required to complete academic work during the

suspension, the *Laney* court concluded that this in-school suspension did not "implicate [her]

property interest in a public education."  *Id.* at 582; *see also Couture v. Bd. of Educ. of

Albuquerque Pub. Schs.*, 535 F.3d 1243, 1257 (10th Cir. 2008) (twenty-one time outs totaling

twelve hours over two-and-a-half months did not require procedural due process protections);

*Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 563 n.3 (8th Cir. 1988) ("We do not believe . . . that

the *Goss* decision requires adherence to the strictures of procedural due process in the context of

a temporary in-school suspension.").

　　　　Numerous other federal courts also have declined to find a constitutionally protected

property interest when a student is subjected to an in-school suspension that includes assigned

school work.  *See Burge ex rel. Burge v. Colton Sch. Dist. 53*, 100 F. Supp. 3d 1057, 1074-76 (D.

Or. 2015) (student not deprived of property interest in public education by three-and-one-half

day in-school suspension that included class work and adult supervision); *Jones v. Long Cty.

Sch. Dist.*, No. CV 211-005, 2012 WL 3562300, at *5 (S.D. Ga. Aug. 14, 2012) (because there

must be a total exclusion from the educational process for a suspension to constitute a

deprivation of a property interest in public education, in-school suspension days would not be

counted toward days student was excluded from educational process); *Mason v. Bd. of Educ.*,
Civil Action No. WMN-10-3143, 2011 WL 89998, at *4 (D. Md. Jan. 11, 2011) (noting that
courts have consistently held that a student's in-school suspension does not implicate the
requirements of due process and neither would an in-school detention); *Dickens v. Johnson Cty.
Bd. of Educ.*, 661 F. Supp. 155, 156-58 (E.D. Tenn. 1987) (no procedural due process required
when plaintiff was subjected to four-and-one-half hour time-outs in a cardboard box in his
classroom on six consecutive days, but was encouraged to perform class work and allowed to
attend classes); *Fenton v. Stear*, 423 F. Supp. 767, 771 (W.D. Pa. 1976) (student's due process
rights were not infringed when school imposed a three-day in-school suspension in a so-called
"jail room," during which plaintiff was supervised by teacher and required to do school work).
While there may be circumstances in which an in-school suspension would deprive a student of
his or her constitutionally protected property interest in a public education, I.U.'s is not such a
case. *Cf. Schafer v. Hicksville Union Free Sch. Dist.*, No. 06-CV-2531(JS)(ARL), 2011 WL
1322903, at *8 (E.D.N.Y. Mar. 31, 2011) ("Precisely where to draw the line between meaningful
and de minimus deprivations is not entirely clear…."). I.U. remained in school during his one-
day suspension, under the supervision of a teacher and a teacher's aide, and with an appropriate
academic assignment. Plaintiffs have cited, and this court has found, no case that supports their
position that the circumstances of I.U.'s March 25, 2011, in-school suspension deprived him of a
constitutionally protected property interest. *See Burge*, 100 F. Supp. 3d at 1075 (collecting
cases).

     2. <u>Substantive due process</u>

     "The touchstone of [substantive] due process is protection of the individual against
arbitrary action of government." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). It is

well-settled that "'only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)); *see also Martinez v. Cui*, 608 F.3d 54, 64-65 (1st Cir. 2010). "'There is no scientifically precise formula for determining whether executive action is – or is not – sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment,'" *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)), but "acts that shock the conscience must be 'truly outrageous and intolerable[.]'" *Id.* (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)). The First Circuit has commented that the "'shock the conscience' standard is imprecise[,]" *DePoutot*, 424 F.3d at 118 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)), but some useful guidelines have been established. "Conceptually, [the standard] does not replicate, or even draw upon, negligence law." *Id.* "Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct *intended to injure* in some way unjustifiable by any government interest.'" *Id.* at 119 (quoting *Lewis*, 523 U.S. at 849) (emphasis supplied).

> A hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with 'violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'

*González-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010) (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (alterations in original)).

"Where, as here, . . . [P]laintiff[s'] substantive due process claims challenge the constitutionality of certain executive [as opposed to legislative] acts, '… [P]laintiff[s] must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived [them] of a

protected interest in life, liberty, or property."' *Harron*, 660 F.3d at 536 (emphasis in original) (quoting *Pagan*, 448 F.3d at 32). The First Circuit has not "adopted a rigid two-step analysis in which one showing necessarily must proceed the other . . . but [the court] typically h[as] looked first to whether the acts alleged were conscience-shocking." *Id.* (citing *Martinez*, 608 F.3d at 65 n.9).

"Here, [Defendants'] conduct does not approach the 'extremely high' standard required for behavior that shocks the conscience." *Hankey v. Town of Concord-Carlisle*, Civil Action No. 13-cv-11870-IT, 2015 WL 5737136, at *14 (D. Mass. Sept. 30, 2015) (quoting *Meléndez-García v. Sánchez*, 629 F.3d 25, 36 (1st Cir. 2010)). The undisputed evidence shows that Defendants took some, even if inadequate, steps to investigate statements that I.U. had misbehaved more than once on March 23 and 24, 2011. Thus, Defendants' decision that some discipline was warranted cannot fairly be characterized as an arbitrary exercise of authority. *See Lewis*, 523 U.S. at 845; *see also DePoutot*, 424 F.3d at 119-20 (police officer's on-the-spot conclusion that plaintiff was obstructing a breathalyzer test, even if mistaken, was not unreasonable under the circumstances). Moreover, "[a]s unfortunate as it may be, a short suspension from school, however unjust, does not 'shock the conscience' in any objective sense." *Schomburg v. Johnson*, Civil Action No. 08-11361-GAO, 2009 WL 799466, at *4 (D. Mass. Mar. 25, 2009). Viewing the evidence in the light most favorable to Plaintiffs, the discipline imposed might have been outside the norm for the School, unduly harsh, and ineffective from a pedagogical standpoint. Plaintiffs have pointed to no evidence, however, that Defendants' conduct was intended to injure I.U. in some way unjustifiable by the School's interest in maintaining discipline, or was inspired by malice or sadism rather than a careless or unwise excess of zeal. *DePoutot*, 424 F.3d at 119-20. *Contrast Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069, 1077 (11th Cir. 2000) (substantive

due process violation sufficiently alleged where coach, as punishment, intentionally hit football player in the head with a metal lock, which knocked out his eye), *and Orange v. Cty. of Grundy*, 950 F. Supp. 1365, 1373 (E.D. Tenn. 1996) (allegations of punitive isolation of students in cold, dirty storage closet with no access to restroom or food for entire day stated substantive due process claims), *with Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1258 (10th Cir. 1996) (finding no substantive due process violation where teacher repeatedly called sixth grade student a prostitute and encouraged other students to harass her).

I.U. fares no better if his case is treated as one of corporal punishment based on the hit or slap delivered by Ms. Hall. "[T]he use of force in the context of student discipline would in certain circumstances likely support a substantive due process claim." *Varney*, 2015 WL 2381161, at *3. Courts have, however, held that physical force similar to the force that allegedly was used in this case does not violate a student's substantive due process rights. In *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775 (10th Cir. 2013), for example, the court held that a slap on the cheek, a slap on the arm that left a red mark, and physical restraint by the student's shoulders did "not rise to the level of a constitutional tort." *Id.* at 787; *see also Varney*, 2015 WL 2381161, at *3 (allegations that education technician grabbed seven-year old child, then forcibly restrained and physically assaulted her were insufficient to state a claim for violation of student's substantive due process rights).

Plaintiffs' reliance on *Doe v. Fournier*, 851 F. Supp. 2d 207 (D. Mass. 2012), is misplaced. The court's opinion in *Fournier* is a ruling on a motion to dismiss. Doe alleged that a guidance counselor initiated a relationship with her through activities at her high school and then had consensual sex with her as part of a contest he was engaged in with another employee to seduce as many students as possible. She further alleged that school administrators were well

aware of the guidance counselor's inappropriate conduct with female students.  In response to

the defendants' contention that the plaintiff had failed to claim the deprivation of any federally-

protected right, the plaintiff alleged that the guidance counselor's sexual harassment deprived her

of her right to bodily integrity.  *See id.* at 219.  Observing that "[s]ome decisional law supports

the existence of a due process violation when a teacher engages in a consensual sexual

relationship with a student[,]" the court denied defendants' motion to dismiss because it was

unwilling "to find . . . that consensual sexual relations with a student over the age of consent can

*never* constitute a substantive due process violation."  *Id.* at 220.  There was no discussion in

*Fournier* about whether the guidance counselor's conduct "shocked the conscience," an issue

that the court stated could be "revisited on summary judgment."  *Id.*

   In contrast, I.U. has identified his property interest in a public education as the

constitutionally protected interest at stake.  This is an interest that courts have consistently held is

not infringed by a temporary in-school suspension.  This is, moreover, a summary judgment

motion, and the factual circumstances of I.U.'s suspension have been sufficiently fleshed out in

discovery that it is appropriate to address whether those circumstances approach the extremely

high standard required for proof of behavior that shocks the conscience in the constitutional

sense.  *See Hankey*, 2015 WL 5737136, at *14.  As a matter of law, they do not.

   There is a certain measure of cognitive dissonance in the recommendation that Plaintiffs'

claims for reckless infliction of emotional distress be allowed to proceed, while judgment should

enter on their claims for a violation of substantive due process because the facts alleged do not

shock the conscience in a constitutional sense.  The standards set by the courts for judging the

sufficiency of allegations supporting such claims are, after all, couched in similar language.  *See*

*Polay*, 10 N.E.3d at 1128; *Harron*, 660 F.3d at 536; *González-Fuentes*, 607 F.3d at 881.  In the

court's view, however, starting with *Agis*, application of these standards to factual allegations has differed.  Massachusetts courts, and federal courts applying state law, have, at least in some cases, been relatively permissive in leaving for a jury's consideration the question of what conduct "shocks the conscience."  *See generally Agis*, 355 N.E.2d at 315; *Boyle*, 392 N.E.2d at 1053; *see also Fletcher*, 199 F. Supp. 2d at 232; *McCarthy*, 188 F. Supp. 2d at 72-72; *Tynecki*, 875 F. Supp. at 34.  The bar generally has been set high at the summary judgment stage when the claim is for a violation of substantive due process rights.  *See, e.g., DePoutot*, 424 F.3d at 117-19 (discussing application of "shocks the conscience" standard).

        3.  Qualified immunity

Defendants claim that even if they violated I.U.'s due process rights by disciplining him, Ms. Wang and Ms. Hall are entitled to qualified immunity because the constitutional rights that were infringed were not clearly established as of March 2011 (Dkt. No. 95).  Plaintiffs contend that *Goss* clearly established the right to procedural due process before a school suspension, thereby precluding application of the doctrine of qualified immunity.  In the court's view, Defendants have the better of the argument.

Qualified immunity protects public officials from liability for damages "except [for] 'the plainly incompetent [and] those who knowingly violate the law[.]'"  *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "A two-part framework governs whether a defendant is entitled to qualified immunity."  *Id.* (citing *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011)).  The first question to be decided is whether the facts, viewed in the light most favorable to Plaintiffs, makes out a constitutional violation.  The second is whether the right allegedly violated was 'clearly established' at the time the offending conduct occurred."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  This latter step

encompasses two inquiries: "whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that [s]he was violating the right." *Id.* (citing *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)).  Although Plaintiffs, relying on *Goss*, have limited their arguments about qualified immunity to the alleged procedural due process violation, this court addresses separately whether Ms. Wang and Ms. Hall are entitled to qualified immunity for alleged violations of procedural and substantive due process.  *See id.* at 24.

a.  Procedural due process

A federal court may, but need not, bypass the first step of the qualified immunity analysis.  *See Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014).  Here, the court has concluded that Plaintiffs have failed to establish that I.U.'s in-school suspension deprived him of a constitutionally protected property interest without due process.  *See supra*, pp. 14-17.  Even if the court has erred in this conclusion, however, Ms. Wang and Ms. Hall are entitled to qualified immunity.

"An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct."  *Id.* at 2023 (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011)).  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that [s]he was violating it."  *Id.*  Ms. Wang and Ms. Hall did not violate a right to procedural due process that was clearly established in March 2011.  "There were no Supreme Court cases, no 'cases of controlling authority in [Plaintiffs'] jurisdiction at the time of the incident,' and 'no consensus of cases of persuasive authority' showing that [P]laintiffs' asserted

[Fourteenth] Amendment rights were clearly established in [2011]." *Walden v. City of Providence, R.I.*, 596 F.3d 38, 53 (1st Cir. 2010) (quoting *Wilson v. Layne*, 525 U.S. 603, 617 (1999)).

In *Goss*, the United States Supreme Court held that a student was entitled to notice and an opportunity to be heard before "the total exclusion from the educational process for more than a trivial period." *Goss*, 419 U.S. at 577. Following *Goss*, federal courts have consistently ruled that an in-school suspension that includes an educational component does not totally exclude a student from the educational process, and, for this reason, does not give rise to a due process right to a pre-suspension hearing. A majority of the cases on which this court has relied in concluding that the suspension imposed on I.U. did not infringe his property right in a public school education were decided before Ms. Wang and Ms. Hall disciplined I.U. on March 25, 2011. *See Ford*, 768 F.3d at 27 (whether official is entitled to qualified immunity depends on whether law was clearly established at the time of the alleged constitutional violation). While there are variations in the facts of the cases, there was – and is – a general consensus among the federal courts that have considered the issue that an in-school suspension during which a student continues to participate in the educational process does not require pre-suspension notice and an opportunity to be heard. For this reason, reasonable officials in the shoes of Ms. Wang and Ms. Hall would not have had a reason to believe that they were required to afford I.U. notice and an opportunity to be heard before imposing a temporary in-school suspension as discipline for his alleged misconduct. *See Plumhoff,* 134 S.Ct. at 2023-24; *Ford*, 768 F.3d at 28 (in view of dearth of case law suggesting that inmate was entitled to more process than he received, prison officials could reasonably conclude that he had received adequate pre-disciplinary process).

    b.  Substantive due process

For the same reason, Ms. Wang and Ms. Hall are entitled to qualified immunity from suit for Plaintiffs' claims that their conduct violated I.U.'s substantive due process rights.  Plaintiffs have not cited, and this court has not found, any case in which school officials' conduct like the conduct alleged in this case has been found to provide an adequate basis for a student's substantive due process claim.  *See, e.g., Varney*, 2015 WL 2381161, at *3; *Schomberg*, 2009 WL 799466, at *4; *see also Muskrat*, 715 F.3d at 787.

    4.  <u>The School's liability</u>

The School may be held liable under Section 1983 "for actions taken pursuant to an official policy or an official custom that violated the Constitution."  *Walden*, 596 F.3d at 55 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005)).  Plaintiffs do not contend that the School had an official custom or policy of imposing suspensions in violation of a student's constitutionally protected due process rights.  Rather, they contend that the School is liable because, as principal, Ms. Wang had final policymaking authority as to student discipline.  *See id.* (a plaintiff can establish an official policy by showing that the alleged constitutional violation was caused by a person with final policymaking authority); *see also, e.g., Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008); *Doe v. Bradshaw*, Civil Action No. 11-11593-DPW, 2013 WL 5236110, at *7 (D. Mass. Sept. 16, 2013).  "Whether an official is a final policymaker is . . . a question of law for the trial judge to decide," *Walden*, 596 F.3d at 55 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)), and that decision should be made by reference to state law.  *See, e.g., Walden*, 596 F.3d at 55; *Doe v. Town of Stoughton*, Civil Action No. 12-10467-PBS, 2013 WL 6498959, at *3 (D. Mass. Dec. 10, 2013).  "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, [the policymakers] have retained the authority to

measure the official's conduct for conformance with *their* policies." *City of St. Louis v.*

*Praprotnik*, 485 U.S. 112, 127 (1988).

State law provides that the members of the School's Board of Trustees, collectively, are

the final policymakers for matters occurring at the School.  Under Massachusetts law, a

Commonwealth charter school, such as the School, operates under a charter granted by the

Commonwealth's Board of Elementary and Secondary Education.  *See* Mass. Gen. Laws ch. 71,

§ 89(a) and (c).  As a charter school, the School operates independently of any local school

committee, "and is managed by a board of trustees," which is, by statute, "authorized by the

commonwealth to supervise and control the charter school."  *See id.,* § 89(c).  A charter school's

internal form of governance is determined by the school's charter.  *See id.,* § 89 (bb).  The

School's By-laws provide that its Board of Trustees "holds the charter from the state and is

therefore responsible for ensuring that the school and Board members comply with all applicable

laws and regulations" (Dkt. 97-2 at 1).  The By-laws further provide that the Board of Trustees

shall determine the general school policies in compliance with state and federal law, and that the

School principal is "responsible for carrying out the work of the [School] in accordance with the

policies established from time to time by the Board of Trustees" (*id.* at 3).  Thus, the terms of the

School's By-laws strongly imply, if they do not explicitly provide, that Ms. Wang was not a

policymaker with final authority to establish policies for the School.  Rather, the Board of

Trustees retained the authority to establish general school policies, which Ms. Wang then was

responsible for implementing.  *Cf. Town of Stoughton*, 2013 WL 6498959, at *3 (noting that then

Superior Court Judge (now Supreme Judicial Court Chief Justice) Ralph Gants summarized the

statutes governing public schools as providing that school committees make policy which the

school superintendents and principals implement).  Nor is there any evidence that Ms. Wang

acted at the direction of or on behalf of the Board of Trustees as to the discipline imposed on I.U. *Compare Bradshaw*, 2013 WL 5236110 at *8 (declining to dismiss claim at the motion to dismiss stage when it was not clear whether school superintendent was acting on behalf of school committee such that actions could be attributed to final policymakers).  Moreover, it not disputed by Plaintiffs that the School's Board of Trustees suspended Ms. Wang and Ms. Hall on June 5, 2011, because of the events of March 24 and 25, 2011, thereby demonstrating that members of the Board had not delegated, but rather retained, their authority to assess whether Ms. Wang's conduct in disciplining I.U. conformed with the School's policies as established by the Board of Trustees (Dkt. No. 97-3 at 1, ¶ 1).  In these circumstances, plaintiffs have failed to demonstrate that the "final policymaker" doctrine applies in this case.  *See Praprotnik*, 485 U.S. at 127; *see also Walden*, 593 F.3d at 57.  There is no allegation of a pattern or practice of constitutional violations by the School that could give rise to liability under Section 1983.  Plaintiffs have not, therefore, satisfied the *Monell* standard for the School's liability for any violation of I.U.'s constitutional rights.  *See Stoughton*, 2013 WL 6498959, at *4.

For all of the foregoing reasons, I recommend that Defendants' summary judgment motion be allowed as to Count III of the Complaint.[4]

D. <u>Count IV – Breach of Contract</u>

---

[4] This case was removed by Defendants from the state court based on federal question jurisdiction (Dkt. No. 1).  In a federal question case such as this one, a federal court may decide closely related state law claims pursuant to its supplemental jurisdiction.  *See* 28 U.S.C. § 1367. The termination of federal claims does not divest a federal court of its jurisdiction over the related state law claims.  *See Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256-57 (1st Cir. 1996).  "Rather, dismissal of the federal questions merely sets the stage for the court to use its informed discretion regarding whether it should retain the remaining state law claims." *Hootstein v. Collins*, 928 F. Supp. 2d 326, 348 (D. Mass. 2013).  If the presiding judge accepts the recommendation that judgment enter for Defendants on Count III of the Complaint, there will be no remaining federal claims, and the court may consider whether it should retain the remaining state law claims or remand the case to state court.

At least for purposes of this motion, the School does not dispute that the Handbook's provisions related to discipline are in the nature of a contract between the School and Plaintiffs (Dkt. No. 69 at 22).  The parties further agree that the principles established by the Massachusetts Supreme Judicial Court in *Schaer v. Brandeis Univ.*, 735 N.E.2d 373 (Mass. 2000), govern the interpretation of the relevant provisions of the Handbook (Dkt. No. 69 at 22; Dkt. No. 79 at 13).  Plaintiffs' breach of contract claim is based on their contention that the School's Handbook created a reasonable expectation that a student's parents or guardians would be notified prior to the imposition of major discipline such as an in-school suspension (Dkt. No. 79 at 13).  It is uncontested that the School did not give I.U.'s parents advance notice of his suspension.

*Schaer* instructs that the court should "employ 'the standard of reasonable expectation – what meaning the party making the manifestation, the [School], should reasonably expect the other party to give to it.'"  *Schaer*, 735 N.E.2d at 378 (quoting *Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983)); *see also Driscoll v. Bd. of Trs. of Milton Acad.*, 873 N.E. 2d 1177, 1185-86 (Mass. App. 2007) (applying methodology employed in *Schaer* to college-preparatory handbook).  The interpretation of the Handbook "'presents a question of law for the court. . . .  Whether or not a contract is ambiguous is also a question of law for the court.'"  *Driscoll*, 873 N.E.2d at 1185-86 (quoting *Berkowitz v. President & Fellows of Harvard Coll.*, 789 N.E. 575, 581 (2003)).

The Handbook provides, in part, as follows:

Whenever a major disciplinary infraction occurs, the Principal or another administrator will complete and send home a written Incident Report documenting what occurred.  Parents/guardians are expected to return the signed report to the school the next day for the child to be readmitted to his/her class.

> Suspension of the student for up to ten days may be a consequence for a major disciplinary infraction. . . .   When appropriate, suspensions will be administered 'in house[.]'

(Dkt. No. 68-10 at 2-3).  Plaintiffs contend that they could reasonably expect, based on this language, that the School would send home an Incident Report notifying them about any major disciplinary infraction committed by I.U. *before* imposition of an in-school suspension.  Thus, they contend, the School's failure to give them advance notice of I.U.'s suspension was in breach of this provision in the Handbook (Dkt. No. 79 at 14).

The flaw in Plaintiffs' argument is that the provision at issue does not bind the School to send an Incident Report home the day of, the day after, or even the week of, a major disciplinary infraction by a student.  All that is required, under the relevant provision, is that the School send home a written report of any major disciplinary infraction committed by a student at some unspecified point in time, and that a parent or guardian sign and return the Incident Report to the School when the parent or guardian receives the report and before the student returns to the School.  If the Incident Report is not returned to the School on the next day the student returns to School, the School is not required to admit the student to class.  Just as there is no requirement that the School immediately notify a parent of a major disciplinary infraction, there is simply no language in the relevant provision that requires parental notice in advance of the imposition of discipline.  Indeed, the provision on which Plaintiffs rely is completely silent on this point.  Thus, Plaintiffs could not reasonably expect, based on the plain language in the Handbook, that the School would immediately notify them that I.U. had committed a major disciplinary infraction, or would notify them in advance of the imposition of discipline.  *See Schaer*, 735 N.E.2d at 378.  I.U.'s parents presumably would have preferred to be consulted and involved before the School took any significant disciplinary action against their son.  The Handbook,

however, does not require any such advance notification. *See Driscoll*, 873 N.E.2d at 1186-87. Consequently, the School's actions did not violate the Handbook's disciplinary provisions.

It is true that so far as appears from the record, the School treated I.U.'s alleged misconduct as a major disciplinary infraction, but never sent home an Incident Report documenting what had occurred. Plaintiffs do not rely on this possible lapse as a basis for their breach of contract claim. Moreover, it is difficult to conclude that this lapse was in material breach of the disciplinary provisions in the Handbook. "[T]he question of whether a breach is material is typically one for the jury[.]" *Dialogo, LLC v. Bauza*, 456 F. Supp. 2d 219, 225 (D. Mass. 2006) (citing *Prozinski v. Ne. Real Estate Servs., LLC*, 797 N.E.2d 415, 423 (2003)). Cases, however, do arise "where the 'materiality question . . . admits . . . only one reasonable answer[.]'" *Id.* (quoting *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006)). It appears from the record that I.U.'s parents were informed of the events of March 24 and 25, 2011 before I.U. returned to School on March 29, 2011, and that the School admitted him to class that day (Dkt. No. 57, ¶¶ 63-65). Thereafter, he did not return to the School (*id.*). To the extent the School had an obligation to provide I.U.'s parents with an Incident Report before he returned to the School, this lapse does not appear material to the dispute between the parties and does not, therefore, provide a basis for recovery of damages by Plaintiffs. *See Dialogo,* 456 F. Supp. 2d at 225.

For these reasons, I recommend that judgment enter for the School on Count IV of Plaintiffs' Complaint.

IV.    CONCLUSION

For the foregoing reasons, the undersigned recommends that Defendants' motion to dismiss be denied as moot in light of Defendants' subsequently filed summary judgment motion,

and that Defendants' summary judgment motion be denied as to Count I of the Complaint and

allowed as to Counts III and IV.[5]


Dated: June 10, 2016                              /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 UNITED STATES MAGISTRATE JUDGE

---

[5] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.